UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ X

MARYTHERESE MILLER,

                Plaintiff,

   - against -

JOHN McHUGH, SECRETARY OF
THE ARMY,

                Defendant.

------------------------------------------------ X

**OPINION AND ORDER**

**09 Civ. 7425 (SAS)**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/14/11

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       Marytherese Miller, a legal technician in the Office of the Staff Judge Advocate ("OSJA") for the United States Military at West Point, New York ("West Point"), brings suit against her employer, John McHugh, Secretary of the Army (the "Government").[1] Miller primarily alleges employment discrimination on the basis of her disability, failure to accommodate her disability and unlawful retaliation, in violation of the Rehabilitation Act[2] as modified by the Americans

---

[1]    John McHugh has been automatically substituted as defendant during the course of these proceedings pursuant to Fed. R. Civ. P. 25(d).

[2]    29 U.S.C. § 701, *et seq.*

with Disabilities Act ("ADA")[3] and Title VII of the Civil Rights Act of 1964 ("Title VII").[4]  Miller further alleges that the Government maintained a hostile work environment in violation of Title VII and that her personal information was disclosed in violation of the Privacy Act.[5]

The Government moves for summary judgment on the grounds that: (1) Miller cannot establish a prima facie case of discrimination because she is not disabled under the meaning of the ADA; (2) Miller cannot establish a prima facie case of discrimination based on failure to accommodate because her requests for accommodation were granted; (3) Miller cannot establish a prima facie case of retaliation because the Government's actions preceded any of Miller's protected acts and because Miller suffered no adverse employment actions; (4) the Government has offered legitimate, non-discriminatory reasons for its actions; (5) Miller cannot establish a prima facie case of hostile work environment; and (6) Miller cannot establish a prima facie case of a Privacy Act violation.  For the reasons set forth below, the Government's motion is granted in full and this case is

---

[3]     42 U.S.C. § 12101, *et seq.*

[4]     *Id.* § 2000e, *et seq.*

[5]     5 U.S.C. § 552a.  Following a Stipulation and Order of Partial Dismissal entered on 6/23/10, Miller agreed not to pursue additional claims based on the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2611, *et seq.*, and the Federal Employee Compensation Act ("FECA"), 5 U.S.C. § 8101, *et seq.*

dismissed.

## II.   BACKGROUND[6]

Miller has been employed as a legal technician for the OSJA at West Point since approximately 1987.[7]  The duties of a legal technician are similar to those of a court reporter and include:  recording and transcribing hearings, preparing records and cases, making exhibits, and preparing legal reviews and

---

[6]      Both parties submitted written statements of facts pursuant to Local Civil Rule 56.1.  *See* Rule 56.1(a)-(d); *see also Rodriguez v. Schneider*, No. 95 Civ. 4083, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999).  Although Miller's response to Defendant's 56.1 statement contains correspondingly numbered paragraphs admitting or denying defendant's facts, Miller frequently adds argumentation, as does defendant, and bases certain factual statements on a contemporaneously submitted affidavit by Miller.  *See* Defendant's Statement Pursuant to Local Civil Rule 56.1 ("Def. 56.1"); Plaintiff's Statement of Facts Law [sic] pursuant to local civil rule 56.1 ("Pl. 56.1"); 7/8/11 Affidavit of Marytherese Miller ("Miller Aff."), Ex. A to 7/8/11 Verification of Peter J. Cresci, Esq. ("Cresci Ver.").  Miller's affidavit, however, is often inconsistent with her earlier deposition testimony taken on March 9, 2011.  *See* 3/9/11 Deposition of Marytherese Miller ("Miller Tr."), Ex. A to 6/8/11 Declaration of Jaimie L. Nawaday ("Nawaday Decl.").  Any material that first appears in the affirmation and that contradicts earlier deposition testimony must be ignored for the purposes of this motion.  *See Estate of Hamilton v. City of New York*, 627 F.3d 50, 54 (2d Cir. 2010); *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) ("factual allegations that might otherwise defeat a motion for summary judgment will not be permitted to do so when they are made for the first time in the plaintiff's affidavit opposing summary judgment and that affidavit contradicts her own prior deposition testimony.").  Accordingly, I deem defendant's 56.1 statement admitted or denied as set forth by plaintiff except insofar as plaintiff relies on facts contained in Miller's affidavit that contradict earlier deposition testimony.

[7]      *See* Pl. 56.1 ¶ 1; Miller Tr. at 21:10-11; Miller Aff. ¶ 3.

action documents in cadet hearings and investigations.[8]  In 1992, Miller became a lead legal technician,[9] a position with responsibilities including those of a legal technician as well as additional supervisory functions, including "serving as a working leader over three employees."[10]  The lead legal technician is also responsible for balancing and distributing the caseload, training new employees and preparing a superintendent's report.[11]  Until the Spring of 2005, Miller participated in cadet hearings that were held on the fourth floor of Nininger Hall, a building with no elevator.[12]

### A.   Miller's First Surgery and Initial Requests for Worksite Accommodations

After a meniscus tear in February 2005, as well as significant knee pain, Miller underwent knee surgery in April 2005.[13]  Miller returned to work after

---

[8]     *See* Miller Tr. at 22:12-19; *see also* Position Description: Legal Technician, Ex. F to Cresci Ver.

[9]     *See* Pl. 56.1 ¶ 1; Miller Tr. at 29:2-3.

[10]    *See* Position Description: Lead Legal Technician, Ex. F to Cresci Ver.; Miller Aff. ¶ 7.

[11]    *See* Miller Tr. at 111:16-19.

[12]    *See* Pl. 56.1 ¶ 2.

[13]    *See* Miller Tr. at 42:21-43:8, 47:20-48:4.

three weeks with a leg brace and crutches.[14]  Upon returning to work, Miller

presented a doctor's note which limited her use of stairs.[15]  Due to her surgery,

Miller verbally requested to "not have to climb the stairs."[16]  In response, all of

Miller's court hearings were moved from the fourth floor of Nininger Hall to

Building 606 (the OSJA Courtroom), a handicapped accessible location and the

building in which Miller's desk is located.[17]  In September 2005, Miller procured

an additional doctor's note providing that she should engage in "minimal stair

climbing while at work."[18]

      Beginning in September 2006, Miller was told by her supervisors,

Colonel Brendan Donahoe and Captain Ann Ching, that she would need to use the

stairs and that she would be subject to a fitness for duty hearing.[19]  Miller contacted

another supervisor, Colonel Robin Swope, on October 25, 2006, to protest having

---

[14]     *See id.* at 48:7, 54:19-20.

[15]     *See id.* at 55:13-19, 56:21-25; *see also* 4/11/05 Doctor's Note, Ex. C to Cresci Ver.  The April 11 Doctor's Note does indicate disability, though it does not specify restrictions on stair climbing.

[16]     *See* 11/1/07 Testimony of Marytherese Miller ("Miller EEO Test. I"), Ex. O to Cresci Ver. at 38:23-40:13.

[17]     *See* Miller Tr. at 53:16-23.

[18]     *See* 9/15/05 Doctor's Note, Ex. C to Nawaday Decl.

[19]     *See* Miller EEO Test. I at 41:20-44:5.

to walk up stairs and to request an explanation regarding the fitness for duty

hearing.[20]  Swope instructed Miller to get her medical accommodations "properly

documented" so that the OSJA could act in "accordance with regulations."[21]  Miller

was informed that if she provided proper documentation, she would not be required

to climb stairs or to submit to a fitness for duty investigation.[22]  On November 7,

2006, Miller filed a formal written request for medical accommodation asking that

she not be required to use the stairs at Nininger Hall.[23]  In her written request,

Miller also advised the OSJA that she would need a second surgery "[w]ithin the

next six months."[24]  Miller also provided a new doctor's note ordering "[m]inimal

---

[20]     *See* 10/26/06 E-mail Communications with Col. Swope ("Swope Comm."), Ex. D to Nawaday Decl.; also included as Ex. N to Cresci Ver.

[21]     *Id.  Accord* Miller Tr. at 71:16-25 ("[Mr. Billelo] contacted my supervisor and told her that that is the correct procedure that has to be done for an accommodation request.").

[22]     *See* Miller Tr. at 71:16-25.  *See also* 5/8/07 EEO Informal Complaint ("Informal EEO Complaint"), Ex. J to Nawaday Decl. at Testimony of CPT Ann Ching ("he thought they had to hold a Fitness for Duty because they had no office documentation about [] her accommodation").

[23]     *See* 11/7/06 Memorandum, Subject: No Elevator at Nininger Hall ("Formal Memo"), Ex. E to Nawaday Decl.; also included as Ex. N to Cresci Ver. Describing her situation, Miller stated, "I do not believe that I am disabled or that I am truly a 'qualified individual with a disability,' under Title II of the ADA . . . since none of my major life activities are limited."  *See id.* ¶ 3.  Specifically, Miller claimed to be in need of a "temporary situation."  *See id.*

[24]     *See id.* ¶ 7.

6

stairs please."[25]

Miller's request for a temporary worksite accommodation was granted on November 17, 2006.[26]  Miller has never participated in any hearings on the fourth floor of Nininger Hall since returning from surgery in 2005.[27]  Her hearings have been mainly held in the OSJA Courtroom, and since sometime in early 2010, some hearings have also been held in the Red Reeder Room,[28] a handicapped accessible location approximately one half mile from Miller's desk in Building 606.[29]  Miller declined certain accommodations related to traveling to the Red Reeder Room.[30]

### B. Miller's Requests for Parking Accommodation

---

[25]     *See* 11/2/06 Doctor's Note, Ex. E to Nawaday Decl.

[26]     *See* 11/17/06 Temporary Worksite Accommodation ("Worksite Accommodation"), Ex. F to Nawaday Decl.; also included as Ex. N to Cresci Ver.

[27]     *See* Miller Tr. at 165:6-8.

[28]     *See* Miller Aff. ¶ 18; *see also* 4/29/10 Proposed Amendment, Ex. N to Cresci Ver. ¶ 2 ("The commandant determined that the Staff Judge Advocate (SJA) courtroom was not a suitable primary alternate HIH and CAB location. The Honor Committee now schedule the Red Reeder Room as the secondary HIH location.").

[29]     *See* Miller Tr. at 165:9-12.

[30]     *See* 5/24/11 Medical Exam by Dr. Sally Dorfman, Ex. D to Cresci Ver. ("You declined the accommodation.").  The accommodation afforded was some form of a "scooter."  *See* Defendant's Reply in Support of Its Motion for Summary Judgment at 6 n.7.

Miller verbally requested a parking accommodation by phone before returning from work in order to avoid the stairs in West Point's parking lot.[31] Captain Daniel Greiser, her supervisor, advised Miller that such a permit would be too difficult to secure.[32]  Instead, Greiser informed Miller that it would be easier to secure a handicapped parking pass from New York State, which Miller did.[33]  This pass expired in October 2005, and Miller had to take the stairs in the parking lot between October 2005, and February 2007.[34]  During this time, Miller made additional verbal requests for parking accommodations by the OSJA, but was denied.[35]

On February 7, 2007, Miller submitted her first formal written request to West Point for a Reserved Parking Spot.[36]  In response, Miller was granted a

---

[31]     *See* Miller Tr. at 48:12-20.

[32]     *See id.* at 48:24-49:10.

[33]     *See id.* at 49:22-50:13; *see also* Miller EEO Test. I at 40:15-41:4.

[34]     *See* Miller Tr. at 58:8-19.  Even while Miller had a valid New York State Parking Pass, she was not always able to avoid the parking lot stairs.  The New York State Pass, unlike the West Point Pass, entitles its holder to a handicapped space generally rather than to an assigned parking space, and West Point did not have enough handicapped spots.  *See id.* at 50:14-52:2.

[35]     *See id.* at 77:20-23.

[36]     *See* 2/7/07 Request for Reserved Parking Spot ("Parking Request"), Ex. G to Nawaday Decl.

8

temporary reserved parking space on February 13, 2007, for one year.[37]   No other

formal parking accommodation requests were filed by Miller with West Point until

June 2, 2011, at which time Miller was again granted handicapped parking

accommodations by West Point.[38]   Miller did not attempt to renew her New York

State Parking pass until November 2009, at which point her request was granted.[39]

### C.   Miller's Job Reclassification

In 2006, Miller's supervisor, Captain Greiser, was in the process of

updating OSJA job descriptions.[40]   Miller had requested in 2003 that her job

description be updated to better match her actual job responsibilities.[41]   Since

approximately 1993, Miller had been the lead legal technician in charge of two

other legal technicians.[42]   According to the position description maintained by

---

[37]     *See* 2/13/07 Reasonable Parking Accommodation ("Parking Request Grant"), Ex. C to Cresci Ver.  This information was then communicated to Miller on February 20, 2007, *see* 2/20/07 Request for Reserved Parking, Ex. G to Nadaway Decl.

[38]     *See* 6/2/11 Reasonable Parking Accommodation, Ex. C to Cresci Ver.

[39]     *See* Miller Tr. at 81:15-23, 89:14-90:15.

[40]     *See id.* at 98:18-23.

[41]     *See id.* at 99:6-20.

[42]     *See id.* at 109:2-110:21.

OSJA, a lead legal technician serves as a "working leader over three employees."[43] In accordance with this description, Captain Ching, Miller's new supervisor, reclassified Miller as a legal technician rather than a lead legal technician by a memorandum dated April 5, 2007.[44] Miller was informed of this reclassification by e-mail on May 3, 2007.[45] The reclassification took effect on July 8, 2007.[46]

Miller experienced no decrease in grade or salary at the time of her reclassification.[47] Her duties, however, changed, as she no longer distributed the caseload, conducted trainings, or was solely responsible for superintendent's reports and red book pages.[48] Moreover, as lead legal technician, Miller was required to have a higher pay grade than other legal technicians, but as a legal technician, she would not be entitled to an automatic promotion once other legal technicians were promoted.[49]

---

[43]    *See* Position Description: Lead Legal Technician, Ex. F to Cresci Ver. This standard is maintained pursuant to the General Schedule Leader Grade Evaluation Guide, HRCD-5 June 1998, Ex. E to Cresci Ver., at 2.

[44]    *See* 4/5/07 Change in Position Description, Ex. M to Nawaday Decl.

[45]    *See* Miller Tr. at 112:19-113-2.

[46]    *See* 7/8/07 Notification of Personnel Action, Ex. F to Cresci Ver.

[47]    *See* Miller Tr. at 133:16-134:11.

[48]    *See id.* at 131:18-132:9.

[49]    *See id.* at 133:6-134:11.

### D.    Miller's Second Surgery and Informal EEO Complaint

In Miller's Formal Memo requesting worksite accommodation, she notified the OSJA that she would need a second surgery.[50]  On April 26, 2007, Miller submitted a formal written request to her supervisor, Captain Ching, for eighty-eight hours of advanced annual leave on or about May 17, 2007, in order to undergo the second surgery.[51]  Captain Ching denied this request after a meeting with Col. Swope, Lt. Donahoe and Ms. Doughty (West Point's Labor Counselor), and provided a written memo explaining the decision on May 8, 2007.[52]  Captain Ching's memo explained that Miller was not eligible for advanced annual leave, but that Miller could take time off using either leave without pay ("LWOP") or borrowing donated leave from other employees.[53]  Miller did not opt to use either of these options and instead cancelled her surgery.[54]

---

[50]    *See* Formal Memo ¶ 7.

[51]    *See* 4/26/07 Request for Advance Annual Leave, Ex. H to Nawaday Decl.

[52]    *See* 5/8/07 Denial of Request for Advanced Annual Leave, Ex. I to Nawaday Decl.; Informal EEO Complaint, Witness Statement of CPT Ann Ching. In addition to the denial, Captain Ching asserted that Miller had backdated her written request for advanced annual leave.  *See* Denial of Request for Advanced Annual Leave ¶ 3.

[53]    *See* 5/8/07 Denial of Request for Advanced Annual Leave ¶¶ 6-7.

[54]    *See* Miller Tr. at 122:21-127:15.

11

On May 8, 2007, Miller filed an informal complaint with the West Point Equal Employment Opportunity ("EEO") Office.[55]  In her complaint, Miller alleged that she was discriminated against when her request for advanced leave was not approved.[56]  After being denied her request for advanced leave, Miller stated that "she then contacted the COL Colpo the Chief of Staff and CPAC [who] told her she had enough to borrow."[57]  Miller further stated that she believed that she had enough advanced leave, that she had been allowed advanced leave for pre-operative tests, that another employee was granted advanced leave, and that she was "reprised against because she went to the Chief of Staff about their continue [sic] pattern of treatment."[58]

Miller underwent her second surgery on April 26, 2008.[59]  Following this surgery, Miller received doctor's notes prohibiting stair climbing, walking on inclines and walking long distances.[60]  She also received continued doctor's orders

---

[55]    *See* Informal EEO Complaint.

[56]    *See id.* at Section V- Matter(s) Giving Rise to Complaint.

[57]    *Id.*

[58]    *Id.*

[59]    *See* Miller Tr. at 131:10-12.

[60]    *See* 3/18/09 Doctor's Note, Ex. C to Cresci Ver. ("No stair climbing, no long distance walking and please allow to park close to bldg."); 1/21/10 Doctor's Note, Ex. C to Cresci Ver. ("No stairs or incline. Level walking only.");

to park near the building.[61]   More recently, the West Point medical staff also concluded that Miller has a "permanent limiting condition" such that she cannot "walk up and down stairs," cannot "walk on an incline or for long distances," and cannot endure "prolonged standing."[62]   Nonetheless, Miller's difficulties do not affect her ability to perform her job.[63]

###   E.   Miller's 2007 Performance Evaluation and Other Employee Counseling

On June 22, 2007, Miller received her annual performance evaluation.[64]  This was the first annual evaluation that Miller received from her new supervisor, Captain Ching.[65]  While Miller had received evaluation scores of "excellent" (one out of five, or the highest rating) in years preceding 2007, her 2007 evaluation resulted in an overall performance score of "successful" (two out

---

3/24/11 Doctor's Note, Ex. C to Cresci Ver. ("Continue no stairs or incline.").

[61]   *See* 5/6/10 Doctor's Note, Ex. D to Cresci Ver. ("Please allow [Miller] to park close to the building.").

[62]   5/24/11 Medical Exam by Dr. Sally Dorfman.

[63]   *See* Miller Tr. at 43:9-11.

[64]   *See* 6/22/07 Base System Civilian Evaluation Report ("2007 Evaluation"), Ex. B to Nawaday Decl.

[65]   *See* Miller Tr. at 157:8-16.

of five).[66]  Captain Ching explained that the performance evaluation was based on

the fact that Miller "had vocalized for me on more than one occasion that she felt

she did not need to participate in the same training as the other employees and it

would be basically a waste of time and money, that the software shouldn't be used

anymore and so forth."[67]  As a result of her performance evaluation score, Miller

received a sixteen-hour time off award instead of the forty-hour time-off awards

she had received in years in which her performance evaluation score was

"excellent."[68]

       Miller also received periodic employee counseling and guidance

sessions during 2007-2008.[69]  No disciplinary actions or changes in Miller's

---

[66]    *See* Collected Base System Civilian Evaluation Reports of
Marytherese Miller from 2003-2010, Ex. B to Cresci Ver.

[67]    EEO Fact-Finding Transcript of Captain Ching ("Ching Tr."), Ex. K
to Nawaday Decl., at 274:16-22.

[68]    *See* Miller Tr. at 153:25-155:4; *see also* OSJA Evaluation and
Performance Awards, Ex. L to Cresci Ver.

[69]    *See* 2/27/07 Employee Counseling Regarding an Argument from
Captain Ching, Ex. L to Nawaday Decl. ("This is not a disciplinary counseling");
8/2/07 Employee Counseling Regarding Confrontation from Maj. Sutherland, Ex.
L to Nawaday Decl. ("Any further misconduct of this nature may result in
disciplinary action."); 8/24/07 Job Performance Guidelines and Expectations from
Captain Adams, Ex. L to Nawaday Decl.; 9/10/07 Work Standards for Success and
Excellence from Captain Adams, Ex. L to Nawaday Decl.; 1/17/08 Job
Performance Counseling from Captain Adams, Ex. L to Nawaday Decl.

employment status resulted from these meetings or the associated memoranda.[70]

### F.   Miller's Formal EEO Complaints

On July 9, 2007, Miller filed her first formal EEO complaint.[71]  The complaint alleged discrimination, retaliation and the creation of a hostile work environment based on her supervisors:  (1) denying her leave for the second surgery; (2) reclassifying her position; (2) participating in negative counseling sessions; (3) downgrading her evaluation; (4) discussing medical issues with co-workers present in violation of the Privacy Act; (5) requiring excessive justification for requested leave; and (6) causing her mental and emotional distress.[72]

Miller filed a second formal EEO complaint on March 21, 2008.[73] This complaint further alleged discrimination, retaliation and the creation of a hostile work environment and included a detailed list of instances of alleged

---

[70]   *See* Employee Counseling and Work Guidance Memos, Ex. L to Nawaday Decl.

[71]   *See* 7/9/07 Formal Complaint of Discrimination ("First EEO Complaint"), Ex. N to Nawaday Decl.; also included as Ex. K to Cresci Ver.

[72]   *See id.* Issues ¶¶ 1-7.

[73]   *See* 3/21/08 Formal Complaint of Discrimination ("Second EEO Complaint"), Ex. O to Nawaday Decl.; also included as Ex. K to Cresci Ver.

harassment and discrimination.[74]  Among the specific workplace incidents referred

to in the second EEO complaint as well as in the subsequent Amended Complaint

are:  (1) Captain Greiser's comments in May 2005, asking Miller whether she

"would be ready to climb Storm King Mountain for an office outing," and his

repeated questioning over a month;[75] (2) a comment by Corrine Barnes, a member

of the OJSA management team, "how would you like me to kick your leg and see

how it hurts?;"[76] (3) a statement by co-worker Christine Laiso, "Everyone hates

you, I hate you!;"[77] and (4) a picture that Captain Brian Adams sent around by e-

mail of himself with the caption, "you will remember me!"[78]  Miller also claims

that her unlisted telephone number was released without her consent on an office

roster.[79]  Miller commenced the present action on August 24, 2009.

## III.   LEGAL STANDARD

---

[74]      *See id.* Section V- Matter(s) Giving Rise to Complaint.

[75]      Plaintiff's Amended Complaint ("Am. Compl.") ¶ 8.

[76]      Second EEO Complaint, Section V- Matter(s) Giving Rise to
Complaint; *see also* Miller Aff. ¶ 24(c).

[77]      Miller Aff. ¶ 24(d).

[78]      *See id.* ¶ 24(a); *see also* Picture Exhibit, Ex. G to Cresci Ver.; Sworn
Testimony of Christine Laiso, Ex. H to Cresci Ver. at 45:15-46:17 (stating that the
picture was sent to several employees and was probably a joke).

[79]      *See* Plaintiff's Brief in Opposition to Summary Judgment ("Opp.
Mem.") at 24.

A.    **Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[80] "'An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  A fact is material if it might affect the outcome of the suit  under the governing law.'"[81]

"The moving party bears the burden of establishing the absence of any genuine issue of material fact."[82]  "When the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim."[83]  In turn, to defeat a motion for summary judgment, the non-moving party must raise a genuine issue of material fact.  To do so, the non-moving party "'must do more than simply show that there is some metaphysical doubt as to the material

---

[80]    Fed. R. Civ. P. 56(a).

[81]    *Fincher v. Depository Trust & Clearing Corp.,* 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)).

[82]    *Zalaski v. City of Bridgeport Police Dep't*, 613 F.3d 336, 340 (2d Cir. 2010).

[83]    *Cordiano v. Metacon Gun Club, Inc.*, 575 F.3d 199, 204 (2d Cir. 2009).

facts,'"[84] and "'may not rely on conclusory allegations or unsubstantiated speculation.'"[85]

In deciding a motion for summary judgment, a court must "'construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.'"[86]  However, "'[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'"[87] "'The role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried.'"[88]

**B.**   **Summary Judgment and Employment Discrimination**

"'[S]ummary judgment is appropriate even in discrimination cases,

---

[84]   *Brown v. Eli Lilly & Co.*, – F.3d – , 10 Civ. 512, 2011 WL 3625105, at *10 (2d Cir. Aug. 18, 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

[85]   *Id.* (quoting *Federal Deposit Ins. Corp. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010)).

[86]   *Brod v. Omya, Inc.,* – F.3d –, No. 09 Civ. 4551, 2011 WL 2750916, at *7 (2d Cir. July 18, 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)).

[87]   *Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)) (emphasis removed).

[88]   *Brod*, 2011 WL 2750916, at *7 (quoting *Wilson v. Northwestern Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

18

for . . . the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to other areas of litigation.'"[89]   Indeed, "'[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.'"[90]

> "Because direct evidence of an employer's discriminatory intent will rarely be found," motions for summary judgment in employment discrimination actions should be evaluated with caution.   "However, even in the discrimination context, a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment."[91]

"Courts 'must . . . carefully distinguish between evidence that allows for a reasonable inference of discrimination and evidence that gives rise to mere speculation and conjecture.'"[92]

---

[89]   *Lu v. Chase Inv. Serv. Corp.*, 412 Fed. App'x 413, 415 (2d Cir. 2011) (quoting *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000), superseded by statute on other grounds as stated in *Ochei v. Coler/Goldwater Mem'l Hosp.*, 450 F. Supp. 2d 275, 282 (S.D.N.Y. 2006)).   *Accord Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).

[90]   *Feingold v. New* York, 366 F.3d 138, 149 (2d Cir. 2004) (quoting *Abdu-Brisson*, 239 F.3d at 466).

[91]   *Gear v. Department of Educ.*, No. 07 Civ. 11102, 2011 WL 1362093, at *2 (S.D.N.Y. Mar. 30, 2011) (quoting *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997)).

[92]   *Fall v. New York State United Teachers,* 289 Fed. App'x 419, 420 (2d Cir. 2008) (quoting *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 448 (2d Cir. 1999)).

19

> "[T]he plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action . . . . To get to the jury, it is not enough . . . to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination."[93]

## IV.   APPLICABLE LAW

### A.   Failure to Accommodate

A federal employee's "sole claim for discrimination on the basis of disability is under the Rehabilitation Act, if anywhere."[94]  Section 501 of the Rehabilitation Act provides that:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity

---

*Accord Cameron v. Community Aid for Retarded Children, Inc.*, 335 F.3d 60, 63 (2d Cir. 2003) ("'[P]urely conclusory allegations of discrimination, absent any concrete particulars,' are insufficient" to satisfy an employee's burden on a motion for summary judgment.) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)).

[93]   *Tori v. Marist Coll.*, 344 Fed. App'x 697, 699 (2d Cir. 2009) (quoting *Weinstock*, 224 F.3d at 42) (original emphasis removed).

[94]   *Rivera v. Heyman*, 157 F.3d 101, 103 (2d Cir. 1998).  The ADA, by contrast, provides no remedy for discrimination by the federal government, *see* 42 U.S.C. § 12111(5)(B)(i).

> receiving Federal financial assistance or under any program
> or activity conducted by any Executive agency or by the
> United States Postal Service.[95]

Under the Rehabilitation Act, a plaintiff may allege "failure to make reasonable accommodations," and such claims are analyzed under the familiar "burden-shifting analysis established for employment discrimination cases under Title VII of the Civil Rights Act of 1964" by *McDonnell Douglas Corporation v. Green*.[96]

Under the *McDonnell* framework, " a plaintiff must first establish a prima facie case of discrimination."[97]  A plaintiff makes out a prima facie case of failure to accommodate by showing "(1) that he is an individual who has a disability within the meaning of the statute, (2) that an employer covered by the statute had notice of his disability, (3) that with reasonable accommodation, he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations."[98]

The Rehabilitation Act defines an "[i]ndividual with a disability" by

---

[95]    29 U.S.C. § 794(a).

[96]    *Regional Econ. Cmty Action Program, Inc. v. City of Middletwon*, 294 F.3d 35, 48-49 (2d Cir. 2002) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973)).

[97]    *Ruiz v. County of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).

[98]    *Stone v. City of Mount Vernon*, 118 F.3d 92, 96-97 (2d Cir. 1997).

reference to the ADA.[99]  The ADA defines a disability as either:  "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment."[100]  Under this definition, a court must determine:  (1) whether plaintiff suffers from a physical or mental impairment, (2) whether the impairment affects major life activities, and (3) whether the impairment substantially interferes with the major life activity identified.[101]  Major life activities are those of central importance to daily life and include "'functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.'"[102]  The impairment must also "substantially limit[]" the major life activity

---

[99]    *See* 29 U.S.C. §§ 705(20)(B), 794(d); *see also Stone*, 118 F.3d at 96 ("The terms common to both [the ADA and the Rehabilitation Act] are to be interpreted in the same way.").

[100]    42 U.S.C. § 12102(1).  For the purposes of this motion the Court will ignore the 2009 amendments to the ADA regarding all actions taken prior to the amendments, *see Wega v. Center for Disability Rights, Inc.*, 395 Fed. App'x 782, 784 n.1. (2d Cir. 2010) ("[T]here is no indication that Congress intended the ADA Amendments to have retroactive effect.").

[101]    *See Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 641 (2d Cir. 1998) (quoting *Bragdon v. Abbott*, 524 U.S. 624, 631 (1998)), superseded by statute as stated in *Ragusa v. Malverne Union Free School Dist.*, 381 Fed. App'x 85, 88 (2d Cir. 2010).

[102]    *Capobianco v. City of New York*, 422 F.3d 47, 56 (2d Cir. 2005) (quoting 29 C.F.R. § 1630.2(I)).  *Accord Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002).

rather than cause trivial disruptions.[103]   Factors included in determining whether interference is substantial include:  "(i) [t]he nature and severity of the impairment; (ii) [t]he duration or expected duration of the impairment; and (iii) [t]he permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."[104]

"[I]t is the responsibility of the individual with a disability to inform the employer that an accommodation is needed."[105]   However, at times "the employer is obligated to provide a reasonable accommodation when it perceives the employee to be disabled, whether or not the employee has asked for an accommodation."[106]   When accommodating an employee, the employer is not required to "provide every accommodation the disabled employee may request" or to "provide the employee with the accommodation of her choice."[107]   It is sufficient that "the accommodation

---

[103]   *See* 29 C.F.R. § 1630.2(j)(1)(i)-(ii).

[104]   *Id.* § 1630.2(j)(2)(i)-(iii).

[105]   *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 135 (2d Cir. 2008) (citing *Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 (2d Cir. 2006)).

[106]   *Brady*, 531 F.3d at 135.

[107]   *Fink v. New York City Dep't of Personnel*, 53 F.3d 565, 567 (2d Cir. 1995).

provided is reasonable."[108]

If the plaintiff succeeds in establishing a prima facie case of discrimination, then the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action.[109]  Finally, if the employer articulates a non-discriminatory reason for the challenged action, the burden shifts back to the plaintiff to demonstrate that the defendant's explanation was pretextual.[110]

### B.   Retaliation

Title VII "makes it unlawful for an employer to discriminate against an employee 'because he [or she] has opposed any practice made an unlawful employment practice by this subchapter, or because he [or she] has made a charge . . . in an investigation, proceeding, or hearing under this subchapter.'"[111]  Claims of unlawful retaliation can be brought under the Rehabilitation Act and "are analyzed under the same burden-shifting framework established for Title VII cases" under *McDonnell*.[112]

---

[108]   *Id.  Accord Gronne v. Apple Bank For Sav.*, 1 Fed. App'x 64, 67 (2d Cir. 2001); *Querry v. Messar*, 14 F. Supp. 2d 437, 445 (S.D.N.Y. 1998).

[109]   *See Ruiz*, 609 F.3d at 492.

[110]   *See id.*

[111]   *Kaytor*, 609 F.3d at 552 (quoting 42 U.S.C. § 2000e-3(a)).

[112]   *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

24

A prima facie case of retaliation is established by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action."[113] An allegation of retaliation is separate from and independent of whether or not plaintiff is disabled.[114] "Actions are 'materially adverse' if they are 'harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination.'"[115] To show that an employer's retaliation resulted in an adverse action, a plaintiff must "proffer objective indicia of material disadvantage; 'subjective, personal disappointment[]' is not enough."[116]

A plaintiff may demonstrate causation in a retaliation claim: "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate

---

[113]    *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (quotation marks and citations omitted).

[114]    *See Sarno v. Douglas Elliman-Gibbon & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999).

[115]    *Hicks*, 593 F.3d at 165 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).

[116]    *Beyer v. County of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008) (quoting *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000)).

treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant."[117] "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close."[118]

"At the summary judgment stage, if the plaintiff presents at least a minimal amount of evidence to support the elements of the claim, the burden of production shifts to the defendant to proffer a legitimate non-retaliatory reason for the adverse employment action."[119]  "If the employer produces such evidence, the employee must, in order to avoid summary judgment, point to evidence sufficient to permit an inference that the employer's proffered non-retaliatory reason is pretextual and that retaliation was a 'substantial reason for the adverse employment action.'"[120]

---

[117]    *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (citing *Cosgrove v. Sears, Roebuck & Co.*, 9 F.3d 1033, 1039 (2d Cir. 1993)).

[118]    *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (quotation marks and citations omitted).

[119]    *Kaytor,* 609 F.3d at 552-53.

[120]    *Id.* at 553 (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)).

26

## C.      Hostile Work Environment

An employee seeking to bring a hostile work environment claim must demonstrate that:   (1) she is a member of a protected class; (2) she suffered unwelcome harassment; (3) she was harassed because of her membership in a protected class; and (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment.[121]

> In order to prevail on a hostile work environment claim, a plaintiff must make two showings: (1) that "the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment" and (2) that there is a "specific basis for imputing the conduct creating the hostile work environment to the employer."[122]

Evaluating a hostile environment involves reviewing the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[123]

---

[121]      *See Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986) and *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1305 (2d Cir. 1995)).

[122]      *Duch v. Jakubek,* 588 F.3d 757, 762 (2d Cir. 2009) (quoting *Feingold*, 366 F.3d at 149-50).

[123]      *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993).

The question is whether a reasonable person would have found the environment to be hostile and if the plaintiff perceived it as such.[124] "[A] plaintiff need not show that her hostile working environment was both severe *and* pervasive; only that it was sufficiently severe *or* sufficiently pervasive, or a sufficient combination of these elements, to have altered her working conditions."[125]

### D.    Exhaustion

"EEOC regulations require an employee suing the federal government under the Rehabilitation Act to exhaust certain administrative remedies before initiating a suit in the district court."[126]  "[A]n aggrieved agency employee must first seek EEO counseling within forty-five days of the allegedly discriminatory act.  The employee must then file an EEO complaint with 'the agency that allegedly discriminated against the complainant.'"[127]  In the Title VII context, the Second Circuit has held that "the claims forming the basis of such a suit must first

---

[124]    *See Mormol v. Costco Wholesale Corp.*, 364 F.3d 54, 58 (2d Cir. 2004) (citing *Brennan v. Metropolitan Opera Ass'n*, 192 F.3d 310, 318 (2d Cir. 1999)).

[125]    *Pucino v. Verizon Wireless Commc'ns*, 618 F.3d 112, 119 (2d Cir. 2010) (emphasis in original).

[126]    *Boos v. Runyon*, 201 F.3d 178, 181 (2d Cir. 2000).

[127]    *Id.* (quoting 29 C.F.R. §§ 1614.105(a)(1), 1614.106).

be presented in a complaint to the EEOC or the equivalent state agency."[128]

"Claims not raised in an EEOC complaint, however, may be brought in federal court if they are 'reasonably related' to the claim filed with the agency."[129]  The Second Circuit considers claims reasonably related when:

> (1) the claim would fall within the reasonably expected scope of an EEOC investigation of the charges of discrimination; (2) it alleges retaliation for filing the EEOC charge; or (3) the plaintiff "alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge."[130]

### E.    The Privacy Act

The Privacy Act provides, in pertinent part, "Whenever an agency . . . fails to comply with any other provision of this section, or any rule promulgated thereunder, in such a way as to have an adverse effect on an individual, the individual may bring a civil action against the agency, and the district courts of the United States shall have jurisdiction in the matters under the provisions of this

---

[128]    *Williams v. New York City Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-5(e)(1) and *Legnani v. Alitalia Linee Aeree Italiane, S.P.A.*, 274 F.3d 683, 686 (2d Cir. 2001)).

[129]    *Williams*, 458 F.3d at 70.

[130]    *Alfano v. Costello*, 294 F.3d 365, 381 (2d Cir. 2002) (quoting *Butts v. New York Dep't of Hous., Pres. & Dev.*, 990 F.2d 1397, 1402-03 (2d Cir. 1993), superseded by statute on other grounds as stated in *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684 (2d Cir. 1998)).

subsection."[131]  "To state a Privacy Act claim a plaintiff must show that:  1) the information at issue is a record contained within a system of records; 2) the agency violated the Act with respect to that record; 3) the disclosure had an adverse effect on the plaintiff; and 4) the violation was willful or intentional."[132]  "The Privacy Act defines a 'record' as 'any item, collection, or grouping of information about an individual that is maintained by an agency, *including, but not limited to*, his education, financial transactions, medical history, and criminal or employment history and that contains his name . . . or other identifying particular.'"[133]  The alleged adverse affect must stem from a willful violation of the Act, and not from "mere administrative error."[134]

## V.     DISCUSSION

### A.     Miller's Disability Claims

Miller's failure to accommodate claims include three alleged violations:  (1) failure to accommodate her parking needs up until February 2007,

---

[131]     5 U.S.C. § 552a(g)(1)(D).

[132]     *International Union, Sec., Police, and Fire Prof'ls v. U.S. Marshal's Serv.*, 350 F. Supp. 2d 522, 528 (S.D.N.Y. 2004).

[133]     *Bechhoefer v. United States Dep't of Justice D.E.A.*, 209 F.3d 57, 60 (2d Cir. 2000) (quoting 5 U.S.C. § 552a(a)(4)) (emphasis in original).

[134]     *Dowd v. IRS*, 776 F.2d 1083, 1084 (2d Cir. 1985).

(2) failure to provide her with advanced leave for her second scheduled surgery in May 2007, and (3) the movement of certain hearings to the Red Reeder Room rather than OSJA courtroom sometime after her second surgery.  Miller's failure to accommodate claims fail as a matter of law because (1) she has not produced evidence showing that she was disabled under the meaning of the ADA at the time of the requested parking accommodations and advanced leave, and (2) she has failed to produce evidence sufficient to raise a factual dispute as to whether she was reasonably accommodated regarding the advance leave and the hearings at Red Reeder.

### 1.   Miller Was Not Disabled Under the ADA Prior to Her Second Surgery

Miller's request for advanced leave and inability to secure parking accommodations both occurred in 2006 and 2007, prior to Miller's second surgery.[135]  To determine whether these claims can survive summary judgment, the Court must first address the threshold issue of whether Miller was disabled in the relevant time period.  When "a plaintiff fails 'to offer any medical evidence substantiating the specific limitations to which he claims he is subject due to his condition,' he cannot establish that he is disabled within the meaning of the

---

[135]   After Miller's February 7, 2007, request was granted, she had no need for further parking accommodation.  *See* Def. 56.1 ¶¶ 9-10; Pl. 56.1 ¶ 9.

ADA."[136]  Thus the Court looks to the medical evidence of Miller's disability

found in the record.

Miller relies on her knee surgery and doctor's notes to support the

claim that she was disabled under the ADA.[137]  However, prior to May 2007,

Miller had only two doctor's notes detailing her required accommodations at work,

one stating "minimal stair climbing while at work" and the other "[m]inimal stairs

please."[138]  Miller further testified that between October 2005 and February 2007,

she frequently walked up a significant number of stairs in the parking lot.[139]

Moreover, in Miller's formal request for accommodations on November 7, 2006,

she specifically asked for temporary accommodations.[140]  It was not until Miller's

doctor's notes and her physical exam at West Point in 2009 and later — after her

second surgery — that Miller was absolutely prohibited from climbing stairs,

walking long distances and on inclines, and was told by the West Point medical

---

[136]     *Baerga v. Hospital for Special Surgery*, No. 97 Civ. 0230, 2003 WL
22251294, at *6 (S.D.N.Y. Sept. 30, 2003) (quoting *Johnson v. Saint Clare's
Hosp. & Health Ctr.*, No. 96 Civ. 1425, 1998 WL 236235, at *8, (S.D.N.Y. May
13, 1998)).  *Accord Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir.
1994).

[137]     *See* Opp. Mem. at 9-11.

[138]     *See* 9/15/05 Doctor's Note, and 11/2/06 Doctor's Note respectively.

[139]     *See* Miller Tr. at 58:11-13, 87:8-10.

[140]     *See* Formal Memo ¶ 3.

staff that she had a "permanent injury."[141]  Miller thus provides insufficient

medical evidence in the record to suggest that before May 8, 2007, her difficulties

at work extended beyond hardship climbing stairs.[142]

While Miller's condition prior to her second surgery may have

constituted an impairment, this impairment did not substantially interfere with her

ability to engage in a major life function as required by the ADA.  Though there is

some dispute in this Circuit regarding whether the inability to climb stairs alone

constitutes a major life function, the authority weighs against it.[143]  More

---

[141]     *See* 3/18/09 Doctor's Note; 1/21/10 Doctor's Note; 3/24/11 Doctor's Note; 5/24/11 Medical Exam by Dr. Sally Dorfman.

[142]     Miller's affirmation further adds that she has difficulties in her abilities to "bend, stand, lift, prolonged standing, and sit for long periods of time." *See* Pl. 56.1 ¶ 11; Miller Aff. ¶ 11.  This statement can be read to refer to Miller's condition since 2005.  This description, however, lacks medical substantiation in the record and appears to contradict Miller's earlier deposition testimony.  *See* Miller Tr. at 43:5-21 ("Q:  Is there anything that you're prevented from doing because of your trouble with your leg?  A:  You know, I can't climb the stairs to Nininger Hall, nor the parking lot.").
The Court also notes Miller's assertions in her EEO testimony that as of November 2007, she had trouble sitting for long periods of time, lifting heavy objects, and was unsteady in her walking.  *See* Miller EEO Test. I at 28:16-31:24.  Despite these hardships, Miller's only request for accommodation at work at that time was "[t]o not have to climb the stairs."  *See id.* at 39:23.

[143]     *Contrast Watson v. Arts & Entm't Television Network*, No. 04 Civ. 1932, 2008 WL 793596, at *11 (S.D.N.Y. Mar. 26, 2008) ("To the extent plaintiff is relying on the limitation of her ability to climb stairs, climbing stairs is not a major life activity.") *with Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 299 (S.D.N.Y. 2003) ("Climbing stairs likewise qualifies as a major life activity.").

importantly, though, it is well settled that difficulty climbing stairs or temporary hardship and fatigue do not alone constitute a "substantial impairment" to a "major life activity."[144]  Based on Miller's medical evidence of her difficulty climbing stairs between October 2005 and May 2008, she has not shown that she was substantially limited in a major life function.  Miller's Rehabilitation Act claims based on failure to accommodate her parking needs and request for advance leave therefore cannot survive summary judgment.

### a.    Miller Was Not Regarded by Her Employer as Disabled

Miller has also not shown that her employer regarded her as disabled for purposes of the ADA.[145]  While the Government made certain accommodations for Miller prior to May 2007, such as moving her hearings out of Nininger Hall,

---

*See also Robinson v. Global Marine Drilling Co.*, 101 F.3d 35, 37 (5th Cir. 1996) (climbing stairs is not a sufficiently "basic, necessary function . . . to qualify as a major life activity under the ADA"); *Missick v. City of New York*, 707 F. Supp. 2d 336, 352-53 (E.D.N.Y. 2010) (same); *Addoo v. New York City Bd. of Educ.*, No. 04 Civ. 2255, 2006 WL 5838977, at *8 (E.D.N.Y.  Dec. 18, 2006) (same).

[144]     *See Rogers v. City of New York*, 359 Fed. App'x 201, 203 (2d Cir. 2009) ("an inability to climb stairs, at least in the circumstances alleged, is not a substantial limitation of a major life activity so as to render Rogers disabled under the ADA"); *Sussle*, 269 F. Supp. 2d at 312 ("The 'inability to walk long distances or to climb stairs does not in itself substantially limit' an individual's ability to perform a major life activity.") (citations omitted) (collecting cases).

[145]     *See* 42 U.S.C. § 12102(1)(c).

Miller has not shown that the Government "regarded [her] as disabled *within the meaning of the ADA*."[146]  Prior to May 2007, Miller was only granted temporary accommodations based on hardship climbing stairs, for instance moving the hearings and granting a parking pass.[147]  Because these accommodations do not demonstrate that the Government believed that Miller was suffering from a disability that "substantially limited" her ability to engage in a "major life function," Miller cannot properly show that she was disabled under the ADA.

### 2. Miller Has Not Shown She Was Not Reasonably Accommodated

Miller has also failed to raise facts showing that the Government did not properly accommodate her need for a second surgery and to avoid climbing stairs.  In response to Miller's request for eighty-eight hours of advanced annual leave, Captain Ching responded by written memo on May 8, 2007, informing Miller that the request could not be granted because there was a low likelihood that

---

[146]     *Colwell*, 158 F.3d at 646 (emphasis in original).  *Accord Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 201 (2d Cir. 2004).

[147]     *See, e.g.*, 11/17/06 Temporary Worksite Accommodation (granting temporary relocation of hearings so that Miller could "limit her climbing of stairs").

Miller could "pay back the advanced hours."[148]  Ching also informed Miller that she had two options to take off time for her surgery:  (1) leave without pay, or (2) donated leave.[149]  Miller declined to use these options, and instead cancelled her surgery.[150]  Because it is undisputed that leave without pay or borrowed leave would have enabled Miller to undergo her second surgery, Miller fails to raise facts showing that she was not accommodated.

Miller's only allegation of failure to accommodate that arose after her second surgery concerns the movement of certain hearings to the Red Reeder Room, rather than Building 606.[151]  While Miller's medical evidence from that time does raise a genuine issue of material fact concerning her disability status under the ADA, Miller has failed to show that she was not reasonably accommodated.  Miller testified in her deposition that the Red Reeder Room is handicapped accessible, and it is undisputed that she declined an accommodation to help her travel to that location.[152]  While Miller understandably preferred that all

---

[148]     5/8/07 Denial of Request for Advanced Annual Leave, Ex. I to Nawaday Decl. ¶ 6.

[149]     *See id.* ¶ 7.

[150]     *See* Miller Tr. at 123:14-127:15.

[151]     *See* Miller Aff. ¶ 18.

[152]     *See* Miller Tr. at 165:6-12; 5/24/11; 5/24/11 Medical Exam by Dr. Sally Dorfman.  Though Miller alleges in her affidavit that the Red Reeder Room

hearings be held in Building 606, the Government is not required to provide Miller

with any particular accommodations she requests — only ones that are

"reasonable."  Because the Red Reeder location was handicapped accessible and

Miller was offered assistance traveling to that location, she has failed to raise a

triable issue of fact as to whether the Government failed to reasonably

accommodate her.

### B.    Miller's Retaliation Claims

Miller alleges four instances of retaliation by her employer in

response to her complaints and EEO filings:  (1) her job reclassification; (2) her

lowered performance evaluation grade; (3) the movement of certain hearings to the

Red Reeder Room; and (4) various employee counseling sessions and other

worksite guidance given to her.  Miller's claims of retaliation fail as a matter of

law because (1) her job reclassification occurred before any protected activity; (2)

Miller has failed to rebut the non-retaliatory reasons put forward by the

Government for Miller's evaluation; (3) Miller has not shown any causal

connection between protected events and the movement of certain hearings to the

Red Reeder Room; and (4) her counseling sessions did not include any adverse

---

"cannot be accessed without having to stand for a prolonged period of time, climb
stairs or inclines," Miller Aff. ¶ 18, this appears to conflict with her deposition
testimony, and Miller's submissions do not address why she rejected a proposed
accommodation.

employment consequences.

### 1.  Miller's Job Reclassification Predated Any Protected Activity

Miller's job title was reclassified by Captain Ching on April 5, 2007.[153]  Miller was informed of this change by e-mail on or about May 3, 2007.[154]  Miller did not file her first informal EEO complaint until May 8, 2007.[155]  Despite the fact that the reclassification did not take effect until July 8, 2007, the decision to reclassify predated any EEO or other internal complaints.[156]

While "[t]he plaintiff's burden at the beginning of the case is a light one," the plaintiff must show "that the protected activity preceded the adverse action in order to satisfy the causation requirement."[157]  The failure to submit evidence establishing any protected activity on or before May 7, 2007, is therefore

---

[153]   *See* 4/5/07 Change in Position Description, Ex. M to Nawaday Decl.

[154]   *See* Miller Tr. at 112:12-113:12.

[155]   *See* Miller's Informal Complaint.  According to the informal complaint, Section V- Matter(s) Giving Rise to Complaint, as well as Miller's affidavit she also previously contacted Colonel Colpo, the "Chief of Staff" at some point on May 7, 2007, "after receiving no satisfaction" from her immediate superiors.  Miller Aff. ¶ 5.

[156]   Miller's claim that she was only informed of the reclassification on July 8, 2007, *see* Pl. 56.1 ¶ 19 (citing Miller's affidavit), flatly contradicts her deposition testimony, *see* Miller Tr. at 112:12-113:12.

[157]   *Raniola v. Bratton*, 243 F.3d 610, 624 (2d Cir. 2001).

fatal to Miller's prima facie case of retaliation based on her job reclassification.

### 2.   Miller Has Not Rebutted the Government's Non-retaliatory Reason for Her Evaluation Score

Miller received performance evaluation scores of "successful" on her 2007 and 2008 evaluations, whereas she had received scores of "excellent" for at least the previous four years.[158]  In June 2007, Miller was evaluated by Captain Ching, whereas previous annual evaluations were done by other supervisors.[159] Miller alleges that this creates a prima facie case of retaliation and that Captain Ching retaliated against her for scheduling her surgery as well as for her informal and formal EEO complaints.  Miller bases this claim primarily on the proximity of her protected activity to the alleged retaliation — Miller filed her first EEO complaint naming Captain Ching on May 8, 2007, and was evaluated by Captain Ching on June 22, 2007.[160]

As an initial matter, Miller cannot base a claim of retaliation on her scheduled surgery.[161]  A prima facie case of retaliation involves an employer's

---

[158]    *See* Miller's Base System Civilian Evaluation Reports from 2003-2008, Ex. B to Cresci Ver.

[159]    *See id.*

[160]    *See* Miller Aff. ¶ 23(f); *see also* Miller's 2007 Evaluation.

[161]    *See* Miller EEO Test. I at 97:24-98:3.

retaliation against an employee for engaging in "protected activity."[162]  Protected

activities include opposing "a practice made unlawful by Title VII" or any activity

that the employee has a "good faith" reason to believe is unlawful.[163]  Miller's

prima facie case for discrimination must instead rest upon her EEO complaints or

other internal complaint letters.  Drawing all inferences in Miller's favor, her

submissions make out a prima facie case of retaliation based on her EEO complaint

and Captain Ching's subsequent evaluation.

        Proceeding to step two of the *McDonnell* framework, the Government

offers a non-retaliatory reason for Miller's evaluation score — her reluctance to

participate in staff trainings.[164]  At the time of the evaluation, Ching considered the

fact that "when it came to trying new things and seeking self-employment I had

taken into account that she [Miller] had vocalized for me on more than one

occasion that she felt she did not need to participate in the same trainings as the

other employees and it would be basically a waste of time and money."[165]  Miller

---

[162]   *Galdieri-Ambrosini v. National Realty & Dev. Corp*., 136 F.3d 276, 292 (2d Cir. 1998).

[163]   *Id.  Accord Jute,* 420 F.3d at 175 ("Congress enacted the anti-retaliation clause to shield an employee from employer retaliation following the employee's attempt to challenge discriminatory conduct.").

[164]   *See* Ching Tr. at 274:7-275:7.

[165]   *Id.*

likewise stated during her EEO fact-finding conference testimony that Ching had explained to her that the evaluation score was based upon the fact that "I [Miller] was resistant to training."[166]  The Government has thus met its burden in coming forth with a non-retaliatory reason for Miller's evaluation score.

The third step of the *McDonnell* framework requires that "the plaintiff must then produce evidence that the proffered reason is a pretext."[167]  To defeat summary judgment, it is not enough that Miller claims that Captain Ching's true purpose was retaliation, she must point to admissible evidence that raises a genuine issue of material fact.[168]  However, there are no facts in the record supporting the assertion that Miller's evaluation score was a form of retaliation.  Captain Ching had never given Miller a higher annual evaluation score in the past, and Miller cites to no remarks or behavior by Ching that suggest her reasons were

---

[166]    11/1/07 Testimony of Marytherese Miller ("Miller EEO Test. II"), Ex. P to Nawaday Decl. 73:22-74:2.

[167]    *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009).

[168]    *See Fall*, 289 Fed. App'x at 420; *see also El Sayed v. Hilton Hotels Corp.,* 627 F.3d 931, 933 (2d Cir. 2010)  ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a *prima facie* case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."); *Robinson v. American Int'l Group, Inc*., No. 08 Civ. 1724, 2009 WL 3154312, at *8 (S.D.N.Y. Sept. 30, 2009).

disingenuous.  Therefore, Miller's retaliation claims fail to raise a triable issue of fact and cannot survive summary judgment.

### 3. Miller Fails to Allege Causation Regarding the Hearings in the Red Reeder Room

All of Miller's protected activity, complaint letters, EEO complaints, and the filing of this civil suit took place between May 8, 2007 and August 24, 2009.[169]  While Miller states that certain hearings were moved to the Red Reeder Room, she does not indicate when this occurred.[170]  Reading the record in the light most favorable to the plaintiff, this practice may have begun in January 2010.[171]  To prove that this change of location was retaliatory in nature, Miller must show either a direct causal connection between the protected activities and the retaliation, or some circumstantial evidence, such as proximity, that suggests retaliation.[172]

---

[169]    *See* Informal EEO Complaint; First EEO Complaint; Second EEO Complaint; Plaintiff's First Complaint filed on 8/24/09.

[170]    *See* Miller Aff. ¶ 18.

[171]    *See* Miller Tr. at 164:7-13.  The change of location does not appear in any official documentation until April 2010.  *See* 4/29/10 Proposed Amendment, Ex. N to Cresci Ver. ¶ 2.  The accommodation offered to help Miller travel to the Red Reeder Room is not mentioned in the record until even later.  *See* 5/24/11 Medical Exam by Dr. Sally Dorfman.

[172]    *See Gordon,* 232 F.3d at 117.

Miller has not put forward evidence that raises a genuine issue of fact about what caused the movement to the Red Reeder Room.  There is no evidence in the record that directly establishes that the move was motivated by a retaliatory purpose.  In terms of circumstantial evidence, Miller can only point to the fact that the change was authorized some months after she began to engage in protected activity.  However, "temporal proximity must be sufficiently close" in order to substantiate a charge of retaliation.[173]  In the absence of any further evidence suggesting retaliation, months of separation between protected activity and alleged retaliation cannot be considered very close.[174]  Here, the protected activity and the alleged retaliation were at least five months apart and there is no other evidence showing that the move was motivated by animus toward Miller.  Therefore, Miller has not raised a factual issue of causation in the Government's moving certain hearings to the Red Reeder Room.

### 4. Miller's Counseling Sessions and Other Guidance Involved No Adverse Employment Action

Miller's counseling sessions and other guidance memoranda detailing

---

[173]   *Ballard v. Children's Aid Soc'y*, No. 09 Civ. 5263, 2011 WL 1664980, at *6 (S.D.N.Y. Apr. 28, 2011).

[174]   *See Dixon v. International Fed'n of Accountants*, 416 Fed. App'x 107, 110 (2d Cir. 2011) (four-month separation between protected activity and alleged retaliation alone fails to make out a prima facie case of causation).

her responsibilities as an employee do not rise to the level of adverse employment action.[175]  Though a plaintiff must only make a "de minimis" showing of conduct by an employer that would "dissuade a reasonable worker from making or supporting a charge of discrimination," the Second Circuit has still required that there be some "injury or harm."[176]  Many of the documents submitted by Miller state explicitly that they are not intended as discipline, and that they are standardized guidance documents.[177]  Because adverse impact is an element of a prima facie case of retaliation, its absence is fatal to Miller's claim.

### C.   Miller's Hostile Work Environment Claims

Miller bases her hostile work environment claims on three inappropriate comments made by co-workers:  (1) Captain Greiser's asking Miller whether she "would be ready to climb Storm King Mountain for an office outing,"; (2) co-worker Barnes' asking Miller "how would you like me to kick your leg and see how it hurts?"; (3) co-worker Laiso's remark, "Everyone hates you, I hate

---

[175]    *See* Counseling Sessions and Guidance Memos, Ex. L to Nawaday Decl.

[176]    *Hicks*, 593 F.3d at 164-65 (citations omitted).

[177]    *See Joseph v. Leavitt*, 465 F.3d 87, 91 (2d Cir. 2006) ("[A]n employee does not suffer a materially adverse change in the terms and conditions of employment where the employer merely enforces its preexisting disciplinary policies in a reasonable manner.").

44

you!",  as well as a picture that Captain Adams, a superior, sent by e-mail to Miller and some of her co-workers.[178]  However, "Title VII does not establish a general civility code for the American workplace" and "[s]imple teasing, offhand comments, or isolated incidents of offensive conduct (unless extremely serious) will not support a claim of discriminatory harassment."[179]  Despite the inappropriateness and offensiveness of the comments referred to by Miller, they fail to describe conditions "sufficiently severe or pervasive to alter the conditions of [her] employment."[180]

In addition, to make out a prima facie case for a hostile environment, a plaintiff must establish "that she was harassed because of her membership in a protected class."[181]  Only two of the comments noted by Miller, however, relate to her disability — Greiser's and Barnes'.  Two comments over at least a two-year period are insufficient to constitute a discriminatory environment that is pervasive or severe.  Moreover, although employees may not appreciate receiving a picture

---

[178]     *See* Miller Aff. ¶ 24.  Miller also alleges that she was "frozen out of meetings," but neither the affidavit nor the moving papers provide examples of such behavior.  *See id.*

[179]     *Petrosino v. Bell Atlantic*, 385 F.3d 210, 223 (2d Cir. 2004) (citations omitted).

[180]     *Id.* (citations omitted).

[181]     *Monterroso*, 591 F. Supp. 2d at 584.

of a supervisor by e-mail, Captain Adams' e-mail had nothing to do with Miller's disability and it was not just sent to Miller.[182]   Accordingly, Miller's hostile work environment claim fails as a matter of law.

### D.   Miller's Privacy Act Claim

Miller argues that the Government has violated the Privacy Act by disclosing information about her condition to co-workers and by providing her phone number on an office roster without her consent.[183]   To survive summary judgment, Miller must provide facts that support the elements of the claim including evidence showing that a "record" was disclosed and that she suffered an adverse effect.[184]   While Miller maintains that the Privacy Act elements have been met, these conclusions are unsupported.   For instance, the only incident in the record of co-workers discussing Miller's medical conditions concerns a request by Captain Adams that a co-worker, Christine Henderson, write a statement based on

---

[182]     *See* Picture Exhibit, Ex. G to Cresci Ver., showing Captain Adams fully clothed and striking what Miller refers to as an "Adonis Pose" while facing away from the camera.   *See* Miller Aff. ¶ 24(a).

[183]     *See* Miller Aff. ¶ 25.

[184]     *See International Union, Sec., Police, and Fire Prof'ls*, 350 F. Supp. 2d at 528.

what Miller had told her about her knee injuries.[185]  While this suggests that co-workers had discussed Miller's condition, it fails to show that the government released records, or information from records, concerning Miller.  Miller also fails to explain why the release of her telephone number had any adverse impact upon her.  Because Miller fails to provide evidentiary support for the necessary elements of her Privacy Act claim, the Government is entitled to summary judgment on this claim.

## V.    CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted.  The Clerk is directed to close this motion [Docket No. 30] and this case.

SO ORDERED:

Shira A. Scheindlin
U.S.D.J.


Dated:      New York, New York
            September 14, 2011

---

[185]    *See* 9/23/08 EEOC Testimony of Christine Henderson, Ex. J to Cresci Ver., at 31:2-32:17.

47

**- Appearances -**

**For Plaintiff:**

Peter Jonathan Cresci , Esq.
Cresci & Black LLC
P.O. Box 74, 830 Avenue A
Bayonne, NJ 07002
(201) 436-4126

**For Defendant:**

Jaimie Leeser Nawaday
Assistant United States Attorney
United States Attorney's Office
86 Chambers Street, 3rd Floor
New York, NY 10007
(212) 637-2528